UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRENDAN KRETSCHMER, individually
and on behalf of all others similarly situated,

     Plaintiff,

v.

CURB MOBILITY LLC, CREATIVE
MOBILE TECHNOLOGY, LLC, ARRO,
INC., and FLYWHEEL TECHNOLOGIES,
INC.,

     Defendants.

No._____

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Brendan Kretschmer, individually and on behalf of all others similarly situated, brings this

action against Curb Mobility LLC ("Curb"), Creative Mobile Technologies, LLC ("CMT"),

ARRO, Inc. ("ARRO"), and Flywheel Technologies, Inc. ("FlyWheel"), and alleges as follows:

### I.    INTRODUCTION

1.    Defendants have violated Section 1 of the Sherman Act by entering into horizontal

agreements to fix prices and eliminate competition in the market for on-demand transportation

services facilitated through mobile applications ("apps") or online platforms.

2.    Starting in 2022, the Defendants and Uber Technologies, Inc. ("Uber") entered into

agreements to coordinate pricing among (i) UberX, the standard ride-sharing option from Uber,

(ii) Uber Taxi, the option within the Uber app that lets the user request a licensed taxi, and (iii)

licensed taxis hailed using Defendants' apps. These agreements eliminated competition between

1

Uber and the Defendants and resulted in higher fares, fewer consumer choices, and substantial harm to the competitive process.

3.      After its creation in 2009, Uber drew droves of passengers away from traditional taxis by offering a completely different experience: upfront pricing, dynamic-fare adjustments, and seamless ride-hailing through a mobile phone. In contrast, ride-hailing for traditional taxis was long constrained by government-regulated metered pricing systems that prevented them from responding to market conditions or matching Uber's pricing transparency.

4.      But that changed. Beginning in 2018 and continuing through today, regulators in major cities authorized the Defendants and other taxi-hailing apps to offer upfront pricing and greater flexibility in setting fares for taxi rides hailed through their platforms. This regulatory shift enabled them to compete more effectively with Uber, especially with their own apps.

5.      For the first time in a decade, consumers had meaningful alternatives to Uber's increasingly expensive rides. These reforms set the stage for genuine price competition. By 2021, the Defendants had begun to gain market share, especially in large cities, often underpricing Uber and offering a more reliable service.

6.      In a freely competitive market, Uber and the Defendants would have continued to compete on price, features, and service quality. Consumers would have benefited from this rivalry in the form of lower fares, better experiences, and more choices. But that is not the path that Uber and the Defendants chose to take.

7.      Instead, beginning in March 2022, Uber signed a series of agreements with each Defendant that integrated their ride-hailing technology and allowed users to hail traditional taxis directly through the Uber app. Publicly presented as pro-consumer and pro-driver efforts to expand options and boost incomes after COVID-19, the arrangements in practice eliminated competition

by imposing uniform or near-uniform pricing between UberX and taxis hailed through the Uber app or the Defendants' apps. These arrangements stripped the Defendants of independent pricing authority. In public statements and regulatory filings, Uber confirmed that taxi rides booked through its app using the Defendants' technology would be priced the same as UberX rides. That pricing alignment is expanding nationally and is already in place in cities such as Boston, Chicago, New York City, San Francisco, Seattle, and Washington, D.C.

8. These agreements constitute a *per se* violation of Section 1 of the Sherman Act. They are horizontal arrangements among direct competitors to fix prices—precisely the type of conduct the antitrust laws were designed to prohibit. The agreements are not part of a larger procompetitive endeavor. Their sole purpose is to suppress competition and inflate prices.

9. Accordingly, on behalf of customers who hailed rides through the Uber app in the relevant local geographic markets, Plaintiff seeks to redress and enjoin the Defendants' unlawful conduct, occurring from March 23, 2022, to the present (the "Class Period"). Each local market in which Uber and one or more Defendants implemented the challenged agreements constitutes a separate class or subclass for purposes of class certification.

## II.    PARTIES

### a.  Plaintiff

10. Plaintiff Brendan Kretschmer is a resident and citizen of New York. Over the relevant period, he has used the Uber platform to hail rides. Brendan Kretschmer has not signed up with any of the Defendants' ride-hailing applications and does not have any contractual relationship with the Defendants.

### b.  Defendants

11.     Defendant CMT is a Delaware limited-liability company with a principal place of business in Long Island City, New York. CMT says it "represents the largest and most experienced combined network of taxi and for-hire integrated technology in the world."[1] CMT owns and operates ARRO, Inc., a mobile e-hailing application that allows passengers to request, track, and pay for traditional yellow taxi rides directly through licensed taxi services. CMT is a private company, and its valuation is undisclosed.

12.     Defendant ARRO is a Delaware corporation with a principal place of business in Long Island City, New York. On information and belief, ARRO is a wholly owned subsidiary of CMT. ARRO says it is "a taxi app created to simplify everyday transport through innovative, easy-to-use tools for hailing and paying for taxi rides"[2] and that it "[lets] you E-Hail (see and book available taxis in your area) or E-Pay (easily pay for taxis you're already in) with the tap of a button."[3] ARRO is a private company, and its valuation is undisclosed.

13.     Defendant Curb is a Delaware limited-liability company with a principal place of business in Long Island City, New York. Curb says it is "the #1 taxi app in the US that connects you to fast, convenient and safe rides across the US."[4] In 2023, it launched Curb Select, expanding its service to include black-car vehicles, beginning with coverage in New York City with "plans to expand to other markets."[5] In 2025, it launched SelectXL to offer for-hire vehicles with extra space.[6] Curb is a private company, and its valuation is undisclosed.

---

[1] CMT Group, https://www.cmtgroup.com (last visited Oct. 6, 2025).

[2] ARRO, Inc., *About*, https://www.ridearro.com/about/ (last visited Oct. 6, 2025).

[3] *Id.*

[4] Curb Mobility, LLC, https://www.gocurb.com (last visited Oct. 6, 2025).

[5] Donna M. Airoldi, *Curb Adds Black Car Option*, BUSINESS TRAVEL NEWS (May 19, 2023), https://www.businesstravelnews.com/Transportation/Ground/Curb-Adds-Black-Car-Option (last visited Oct. 29, 2025).

[6] Curb Mobility, LLC, *Meet Curb Select XL: More Space, Same Reliable Rides in NYC*, https://www.gocurb.com/post/meet-curb-select-xl-more-space-same-reliable-rides-in-nyc (last visited Oct. 29, 2025).

14.     Defendant FlyWheel is a limited-liability company with a principal place of business in Huntington Beach, California. FlyWheel says it is "revolutionizing urban mobility by empowering riders with seamless eHailing, supporting drivers with intuitive tools, and providing taxi companies with comprehensive technology solutions."[7] FlyWheel is a private company, and its valuation is undisclosed.

### III.    JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because the matter in controversy exceeds the value of $5,000,000, exclusive of interests and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a state different from any defendant. This Court also has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. § 15.

16.     Venue lies within this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because Defendants resided, transacted business, were found or had agents in this District during the Class Period (defined below), and a substantial portion of the alleged activity affected interstate trade and commerce in this District during the Class Period.

17.     This Court has personal jurisdiction over Defendants because this action arises out of Defendants' conduct in this District during the Class Period.

---

[7] LinkedIn, *Flywheel Technologies, About*, https://www.linkedin.com/company/flywheeltech/about/ (last visited Oct. 6, 2025).

## IV.     FACTUAL ALLEGATIONS

### a.   The Relevant Product Market

#### i.     The Ride-Hailing Services Market

18.     Growing demand for convenient transportation and the widespread adoption of smartphones transformed the way people get around large metropolitan areas. Rather than calling a dispatch line or hailing a taxi on the street, customers could now request a ride directly via mobile applications.

19.     Ride-hailing applications ("Ride-Hailing Apps") are software platforms that connect car drivers with passengers who are looking to obtain transportation. They function as two-sided platforms, connecting drivers and passengers. Passengers use Ride-Hailing Apps directly on their smartphones to request rides, while drivers use the same Ride-Hailing App to receive and respond to those requests. Both passengers and drivers interact with the same underlying software platform, which is remotely hosted and delivered via the internet.

20.     At the end of each ride, the passenger pays a fare through the Ride-Hailing App. The company operating the app typically retains a percentage of the fare, and the remaining balance is automatically sent to the driver. The entire transaction is processed electronically within the app and occurs automatically upon completion of the ride.

21.     Founded in 2009, Uber, a global technology company headquartered in San Francisco, California, was the first company to successfully offer a Ride-Hailing App that connects riders to for-hire vehicles (FHVs) in real-time.

22.     Uber quickly became the largest provider of ride-hailing services in the United States. Its success prompted the emergence of similar platforms such as Lyft, Via, and Juno, which offered nearly identical functionality.

23.    The advent of Uber and other Ride-Hailing Apps decimated the traditional taxi industry. In New York City, for example, yellow taxis provided 411,238 daily rides in January 2015. By January 2025, that figure had declined to 110,654 daily rides. In contrast, rides from Ride-Hailing Apps rose from 60,357 to 658,246 per day over the same period. These numbers illustrate the clear consumer shift toward digitally enabled ride hailing.

24.    In response, traditional taxi technology providers such as the Defendants developed their own Ride-Hailing Apps to offer the ability to hail traditional taxis while providing the same convenience to users. These apps mirror the user experience of Uber, with similar interfaces, upfront price quotes, estimated arrival times, and digital payments.

25.    Successful development allowed them to expand to ride-hailing of FHVs. For example, Curb launched Curb Select (its black-car service) in 2023 and SelectXL in 2025 to offer FHVs with extra space.

26.    Consumers in major metropolitan areas rely on Ride-Hailing Apps for on-demand, private, and efficient transportation. Whether through Uber, Lyft, or apps developed by Defendants, users can hail a vehicle in real-time, track its arrival, and complete payment directly on their smartphone or online.

27.    Ride-Hailing Apps thus compete with each other in the market for on-demand transportation services facilitated through mobile apps or online platforms (the "Ride-Hailing Services Market").

28.    Traditional taxi services that are hailed on the street or by calling a dispatcher (the "Traditional Taxi Market") are not reasonable substitutes for Ride-Hailing Apps as they lack the digital integration and on-demand functionality that define the Ride-Hailing Services Market. The Traditional Taxi Market does not operate through the two-sided platforms that define the Ride-

Hailing Services Market. As the Supreme Court has explained: "Only other two-sided platforms can compete with a two-sided platform for transactions." *Ohio v. Am. Express Co.*, 585 U.S. 529, 546 (2018).

29.     In addition, other modes of transportation are not reasonable substitutes for Ride-Hailing Apps. Unlike public transit, Ride-Hailing Apps allow passengers to travel directly to their destinations without being constrained by fixed routes or schedules. Unlike driving, passengers are not required to own a vehicle or navigate parking limitations. Walking, biking, and scootering also do not offer comparable speed, comfort, or the ability to travel similar distances, and therefore are not reasonable alternatives.

30.     Instead, consumers turn to Ride-Hailing Apps as a distinct and consistent solution for their transportation demands. *Statista Market Insights*, a leading provider of market and consumer data, thus defines the Ride-Hailing Services Market as follows:

> The Ride-hailing market encompasses on-demand transportation services facilitated through mobile apps or online platforms. This market covers both private vehicle rides and taxi services, all booked exclusively online. It includes Transportation Network Companies (TNCs), such as Uber and Lyft, traditional taxis booked via apps, such as Free Now or Cabify, and ride-pooling services, such as Moia and Via. This market excludes peer-to-peer ride-sharing, focusing on professionally operated transport services booked digitally for efficient and convenient urban mobility. Rides of traditional taxi services hailed on the street or booked via telephone are not included in this market.[8]

31.     In short, the cross-elasticity of demand is such that a hypothetical monopolist in the Ride-Hailing Services Market could profitably increase prices by a small but significant amount.

---

[8] Statista Market Insights, *Ride-Hailing – Market Definition*, https://www.statista.com/outlook/mmo/shared-mobility/ride-hailing/united-states (last visited Oct. 6, 2025).

That is because, in response to such a price increase, an insufficient number of customers would switch to alternatives such as traditional taxis, public transportation, or walking.

32.     Accordingly, the relevant product market in this action is the Ride-Hailing Service Market, in which Ride-Hailing Apps, including those offered by Uber and the Defendants, would compete aggressively but for Defendants' misconduct.

### ii.     Ride-Hailing Apps Are Reasonably Interchangeable

33.     Consumers in the Ride-Hailing Services Market perceive minimal differences between providers in terms of service quality, functionality, and user experience. Whether using Uber, Lyft, or applications developed by Defendants, passengers receive the same core service.

34.     In fact, Ride-Hailing Apps are nearly indistinguishable in design and usability, offering similar features such as GPS tracking and display of nearby map, wait times, fare estimates, real-time updates, and digital payment (Figure 1).





**Figure 1: Ride-Hailing Apps Screenshots**
(From left to right, top: Uber, Lyft; bottom: Defendants ARRO, Curb, FlyWheel)

35.     Consumers choose between platforms based on factors like price, wait time, and availability. In addition, platforms have a degree of "stickiness" that can deter consumers from multi-homing or switching between platforms.

36.     While some platforms offer varied vehicle types, these differences do not materially affect consumer substitution patterns, which remain driven by convenience, availability, and price. In fact, a survey of over 1,700 consumers conducted by *Obi* found that the high price of rides is the main reason consumers don't use rideshare more, and 48% call it their biggest frustration.[9]

37.     Drivers on the other side of two-sided platforms also view Ride-Hailing Apps as reasonably interchangeable. According to a study by *The Rideshare Guy*, over 75% of drivers drive for both Uber and Lyft to optimize their time working in the Ride-Hailing Services Market.[10]

---

[9] Obi, *2024 Global Rideshare Report: Obi Reveals Unprecedented Insights into Industry Trends and Consumer Behavior*, PR NEWSWIRE (June 18, 2024), https://www.prnewswire.com/news-releases/2024-global-rideshare-report-obi-reveals-unprecedented-insights-into-industry-trends-and-consumer-behavior-302175543.html (last visited Nov. 19, 2025).

[10] Harry Campbell, *Can You Drive For Uber And Lyft At The Same Time?*, THE RIDESHARE GUY (last updated July 24, 2023), https://therideshareguy.com/how-to-drive-for-uber-and-lyft-at-the-same-time/ (last visited Oct. 6, 2025).

38.     This high degree of substitutability and lack of meaningful product variation shows that Ride-Hailing Apps substantially compete with each other in the Ride-Hailing Services Market, making the market particularly susceptible to coordination or collusion among competitors.

**b.  Competition in the Ride-Hailing Services Market**

39.     The relevant market is highly concentrated. Uber and Lyft hold between 95% and 99% of the national Ride-Hailing Services Market, of which Uber controls 76% and Lyft 24%, according to *Bloomberg Second Measure LLC*.[11]

40.     The Ride-Hailing Services Market in the United States is expected to continue growing over the coming years. According to *Statista Market Insights*,[12] the projected revenue for 2025 is $59.27 billion, with an expected annual growth of 4.15% over the next five years.

**c.  Geographic Markets**

41.     The relevant geographic markets are the local markets described below, because Ride-Hailing Apps compete in the Ride-Hailing Services Market, throughout the United States, at the local level.

42.     Curb offers ride-hailing services in Boston, Charlotte, Chicago, Ft. Lauderdale, Los Angeles, Miami, New Orleans, New York City, Philadelphia, Raleigh, San Francisco, Washington, D.C., and West Palm Beach.

43.     CMT and ARRO offer ride-hailing services in Boston, Chicago, Houston, Miami, New York City, and San Francisco.

---

[11] Michal Kaczmarski, *Uber vs. Lyft: Who's Tops in the Battle of U.S. Rideshare Companies*, BLOOMBERG SECOND MEASURE LLC (Apr. 15, 2024), https://secondmeasure.com/datapoints/rideshare-industry-overview/ (last visited Oct. 6, 2025).

[12] Statista Market Insights, *Ride-Hailing – United States, Highlights*, https://www.statista.com/outlook/mmo/shared-mobility/ride-hailing/united-states (last visited Oct. 6, 2025).

44.    FlyWheel offers ride-hailing services in Los Angeles, Portland, Sacramento, San Diego, San Francisco, and Seattle.

45.    At all relevant times, Uber's app could be used to directly order taxis in Boston, Chicago, New York City, San Francisco, Seattle, and Washington, D.C. using the technology of the Defendants at a same or comparable price to UberX.

46.    The cities of Boston, Chicago, New York City, San Francisco, Seattle, and Washington, D.C. each independently constitute a relevant geographic market for purposes of antitrust analysis ("Local Markets").

47.    Passengers looking for a ride in each of those cities can use Uber and at least one of the Defendants' platforms.

**d.    Barriers to Entry in the Ride-Hailing Services Market**

48.    The Ride-Hailing Services Market is notoriously difficult to enter. There are significant barriers to entry due to the presence of strong network effects.

49.    Ride-Hailing Apps function as two-sided platforms, connecting drivers and passengers. This means that the value of the platform to each group increases as participation from the other group grows.

50.    For passengers, a Ride-Hailing App becomes more valuable when more drivers are nearby, reducing wait times and increasing the likelihood of quickly securing a ride. The same is true for drivers, as a larger pool of nearby passengers means less time waiting between trips and less distance traveling to pick-ups.

51.    These reinforcing dynamics make it difficult for new entrants to compete effectively with well-established Ride-Hailing Apps, as smaller platforms struggle to attract both sides of the market at once.

52.     As reported by *NBC News*, in 2014, Uber's former CEO and founder, Travis Kalanick, described the company's ability to offer competitive prices as attributable to "the network effects of [Uber's] business"[13] and explained that "[m]ore cars and drivers mean better coverage and lower pickup times,"[14] which he argued improved the service overall.

53.     In the relevant market, a new competitor cannot attract drivers without passengers and cannot attract passengers without drivers, creating a "chicken or the egg" problem. Even superior pricing or features do not necessarily overcome the advantage that Uber's large, established network provides.

54.     Operating in this high-barrier, network-driven environment, Uber followed a two-step playbook: subsidize and underprice to build scale, then exploit the resulting dominance. With rivals marginalized and entry effectively foreclosed, Uber was free to exercise pricing power at the cost of consumers.

e.  **Uber's Supracompetitive Pricing Strategy**

55.     In the early stages, Uber used below-cost pricing and heavy subsidies to undercut traditional taxis and rival Ride-Hailing Apps. In its early years (2009-2014), Uber rides were consistently 20–30% cheaper than comparable taxi trips, deliberately positioning itself as the low-cost alternative.[15] According to the *Harvard Business Review*, Uber was at times pricing below its variable costs, losing money on each fare.[16]

---

[13] Geoff Weiss, *Uber Deepens Discounts on Its UberX Service*, ENTREPRENEUR (Jan. 10, 2014), https://www.entrepreneur.com/science-technology/uber-deepens-discounts-on-its-uberx-service/230770 (last visited Oct. 6, 2025).

[14] *Id.*

[15] Sara Silverstein, *These Animated Charts Tell You Everything About Uber Prices In 21 Cities*, BUSINESS INSIDER (Oct. 16, 2014), https://www.businessinsider.com/uber-vs-taxi-pricing-by-city-2014-10 (last visited Nov. 19, 2025).

[16] Rafi Mohammed, *Regulation Is Hurting Cabs and Helping Uber*, HARVARD BUSINESS REVIEW (Jul. 9, 2014), https://hbr.org/2014/07/regulation-is-hurting-cabs-and-helping-uber (last visited Nov. 19, 2025).

56.     This approach was made possible by investor capital and justified by the pursuit of network effects: the more passengers and drivers Uber attracted, the harder it became for new competitors to enter. This pricing strategy attracted millions of users and allowed Uber to rapidly capture market shares.

57.     By rapidly expanding into new cities, often ahead of regulatory frameworks, Uber was able to quickly reach the scale necessary to seize—and then protect—a large share of the Ride-Hailing Services Market. During that time, most meaningful competitors like Sidecar or Juno either ceased operations or were acquired by Uber or Lyft. Even Via terminated its ride-hailing service—which, according to users in Washington, D.C., was "90% of the time much cheaper than Lyft and Uber."[17]

58.     Once Uber thus established market dominance, it began raising prices through several mechanisms: dynamic surge pricing during periods of high demand, reduced driver incentives that allowed Uber to retain a greater share of each fare, and service and booking fees that further inflated the total cost for passengers—a practice often described as "price gouging."

59.     As estimated by *Forbes*, since 2018, Uber has raised its fare per trip on average 17.5% per year.[18] While it enjoyed record profits during that time, "Uber has reached [that] record profitability by gouging both consumers and drivers" through its fare increases and declining driver pay, according to the *National Employment Law Project*.[19] With few viable alternatives,

---

[17] Prince of Petworth, *The Rideshare Service Via, Which Is 90% of the Time Much Cheaper than Lyft and Uber Is Leaving DC*, DEAR POPVILLE (Dec. 15, 2021), https://www.popville.com/2021/12/via-rideshare-leaving-dc/ (last visited Nov. 19, 2025).

[18] Len Sherman, *Uber's New Math: Increase Prices and Squeeze Driver Pay*, FORBES (Jan. 16, 2023), https://www.forbes.com/sites/lensherman/2023/01/16/ubers-new-math-increase-prices-and-squeeze-driver-pay/ (last visited Nov. 19, 2025).

[19] Dan Ocampo, *Uber's Price-Gouging and What We Can Do About It*, NATIONAL EMPLOYMENT LAW PROJECT (Nov. 14, 2024), https://www.nelp.org/ubers-price-gouging-and-what-we-can-do-about-it/ (last visited Nov. 19, 2025).

particularly in cities where traditional taxi services have declined, consumers are often forced to accept these higher prices, even during emergencies or peak times.

60.    Yet Uber's fare increases from 2018 onwards were not accompanied by meaningful improvements in service quality, innovation, or passenger experience. On the contrary, rising wait times, diminished driver availability, reduced customer-support responsiveness, and ongoing safety concerns directly undermined the value proposition previously used to justify lower fares.

61.    In sharp contrast, during the same period when Uber raised fares, competing platforms maintained stable or decreasing prices. Curb's average ride price dropped from $16.89 in 2019 to $13.63 in 2021. Similar trends occurred with other local competitors. This divergence highlights Uber's supracompetitive pricing, imposing substantial price increases despite alternative platforms offering stable or lower fares.

62.    Uber's price-gouging strategy accelerated in mid-2022 with the implementation of its new "upfront pricing" model across the United States, shifting from its previous system of fare and pay determination based on time and distance. Uber now uses proprietary, AI-driven algorithms to set both rider fares and driver compensation on a per-trip basis, allowing Uber to dynamically tailor prices and wages for billions of rides annually.

63.    As explained by *Len Sherman*, Executive in Residence and Adjunct Professor at Columbia Business School: "upfront pricing has proven to be as devilishly effective as it has been opaque."[20] This new pricing model decouples rider cost and driver pay from trip distance or duration. Instead, Uber's secret algorithm seeks to maximize profit by charging riders the highest

---

[20] Len Sherman, *How Uber Became a Cash-Generating Machine*, MEDIUM (June 27, 2025), https://len-sherman.medium.com/how-uber-became-a-cash-generating-machine-ef78e7a97230 (last visited Nov. 19, 2025).

price they may be willing to pay, while simultaneously minimizing driver compensation to the lowest amount a nearby driver is willing to accept.

64.    Consumers thus pay significantly higher prices for no incremental improvement in service quality. *Columbia Business School* conducted a study of the pay and price trip records of Uber drivers who completed tens of thousands of trips over the past five years, as well as an analysis of over two million rideshare trip requests in eight large U.S. cities between 2019 and Q1 2025. Len Sherman summarizes Uber's strategy as follows:

> Uber was launched by a founder who brazenly and boastfully ignored transportation regulations and steamrolled officials who tried to enforce them.
>
> Uber is now led by a CEO who has repeatedly threatened to abandon vital mobility services in localities that propose legislation intended to enhance worker protections or data transparency in the rideshare sector.
>
> Uber's newfound financial success relies heavily on opaque algorithmic price discrimination on both sides of its marketplace and deceptive business practices that boost profits at the expense of riders and drivers, while often delivering degraded service.
>
> To protect its exploitative business model, Uber aggressively deploys technical and legal tactics to prevent data service providers from providing useful decision support tools for riders and drivers.[21]

65.    Economic analysis further corroborates Uber's supracompetitive pricing behavior. At the national level, Uber average fares have greatly outpaced inflation since 2020 (Figure 3).

---

[21] *Id.*



**Figure 3: Uber Average fares have risen much faster than Inflation since 2020[22]**

66.    Taken together, Uber's trajectory—from predatory below-cost pricing to its current regime of supracompetitive, algorithmically driven price discrimination—demonstrates a deliberate strategy: eliminate competition, secure market dominance, and then exploit that dominance to extract higher profits from both riders and drivers. This shift was not a natural evolution of market forces but the product of intentional exclusionary conduct designed to foreclose meaningful alternatives.

67.    Yet a series of regulatory reforms, coupled with effective competitive strategies by the Defendants, began to open the possibility of challenging Uber's dominance in certain regional markets. These reforms created new opportunities for head-to-head competition that could have restored balance to the Ride-Hailing Services Market.

---

[22] *Id.*

68.     In response, Uber took an even more direct road to reduce competition and keep the profits rolling in: colluding with the Defendants to fix prices.

**f.   The Defendants Are Co-Conspirators in a Ride-Hailing Cartel with Uber**

> **i.      *Regulatory Reforms Led to Increased Competition Between Defendants and Uber***

69.     In recent years, regulatory reforms in key cities have reshaped the competitive landscape between Defendants and Uber. Historically constrained by strict fare regulations and meter-based pricing, taxi services were unable to match the predictability of Uber's upfront pricing model. New city-approved pilot programs and rule changes now allow the Defendants to offer upfront fares, enabling them to better compete with Uber on pricing and service predictability.

70.     The Traditional Taxi Market is subject to municipal regulation aimed at controlling entry, pricing, and service quality. Fares are typically determined by government-regulated meter systems, which calculate rates based on the elapsed time and distance of each trip. The use of a taximeter means passengers do not know their total fare until the end of the trip.

71.     The ability to offer upfront pricing has been a key factor in Uber's growth, as passengers value the predictability it provides—a predictability that the Defendants were not allowed to offer for taxi rides.

72.     The regulatory requirement to use taximeters also prevented the Defendants from setting their own prices that factor in demand, traffic, and other dynamic factors, thereby limiting their ability to compete with Uber on price in the Ride-Hailing Services Market.

73.     On March 29, 2018, the New York City Taxi and Limousine Commission ("TLC") launched the "Flex Fare Pilot" program, which allowed Defendants Curb and ARRO to offer fares to taxicab passengers other than those calculated by the taximeter. The program also allowed Curb and ARRO to provide upfront pricing for taxi services. In justifying the program, TLC explained:

18

In New York City, certified taximeters calculate the cost of all yellow taxi and Street-Hail Livery ("SHL") trips. These taximeters are programmed with TLC-mandated rates, displaying the running total of all passenger fares based on the elapsed time and the distance of trips. The operation of a taximeter means passengers do not know their total fare until the end of the trip. However, FHVs [like Uber] offer guaranteed up-front fares to passengers prior to booking a trip. This level of price certainty is attractive to passengers and allows them to comparison shop, a competitive advantage not currently available yellow taxis.[23]

74.    In discussing whether to make the Flex Fare program permanent in 2024, the TLC's Deputy Commissioner for Policy and Community Affairs, James DiGiovanni, stated that the program was meant to provide "more parity between the taxi industry and the FHV industry"[24] so that "the taxi industry can compete for those same consumers."[25] TLC Commissioner David Do likewise explained that the purpose of the Flex Fare program was to provide more, not less, competition, because "there is a lot of market participants here, right, that there are a lot of competitive forces, be it Uber, Lyft, Curb, or even Arro and some of the other providers that James talked about today. And so, really, you know, if a customer sees it too high of a price, they have other choices on their phone as well."[26]

75.    The Flex Fare Pilot program was a significant regulatory shift, as taxi fares in New York City had historically been tightly controlled and calculated strictly by the government-fixed taximeter based on time and distance.

---

[23] New York City Taxi and Limousine Commission, *Notice of Promulgation* (Aug. 14, 2024), https://www.nyc.gov/assets/tlc/downloads/pdf/flex_fare_rule_package_08_14_24.pdf (last visited Oct. 6, 2025).

[24] In Re Public Hearing NYC - Taxi & Limousine Commission, Tr. 12:24–25 (May 8, 2024), https://www.nyc.gov/assets/tlc/downloads/About/commission_meeting_transcript/transcript_05_08_24.pdf (last visited Oct. 6, 2025).

[25] *Id*. at Tr. 13:10-11

[26] *Id*. at Tr. 29:5-12

76.    The pilot program was deemed a success as it gave the Defendants greater flexibility on their fare structure and pricing models. According to the TLC, "the ability to offer upfront pricing for trips has contributed to the growth in the number of E-Hail trips in the taxicab sector and allowed the taxi industry to broaden its services."[27] As a result, the program was made permanent as of September 21, 2024.

77.    Other cities followed suit with similar programs, including Boston (Flex Fare Program, launch in March 2024), Philadelphia (Upfront Flex-Fare Pricing program, launched in 2022), and San Francisco (Taxi Upfront Fare program, was piloted in 2021 and made permanent in 2025). Boston, Chicago, and Seattle, among others, have introduced some pricing flexibility, such as allowing fares to adjust based on demand or dynamic conditions, but still operate within the bounds of the regulated taximeter system.

78.    The ability to offer upfront fares—regardless of flexibility on taximeter rates—is now widely available. On September 10, 2020, Curb began its nationwide rollout of upfront pricing, starting in New York and Washington, D.C. As of mid-2025, all Local Markets allow Ride-Hailing Apps to provide upfront pricing for taxi services.

79.    These regulatory reforms increased competition in the Ride-Hailing Services Market. By allowing the Defendants to offer upfront pricing and some fare flexibility, cities enabled the Defendants to better compete with Uber on a core feature valued by consumers of the Ride-Hailing Service Market: price transparency and predictability.

80.    The historical regulatory barrier that had insulated Uber from price competition was significantly reduced, increasing head-to-head competition between the Defendants and Uber. The

---

[27] New York City Taxi and Limousine Commission, *Notice of Promulgation* (Aug. 14, 2024), https://www.nyc.gov/assets/tlc/downloads/pdf/flex_fare_rule_package_08_14_24.pdf (last visited Oct. 6, 2025).

Defendants were particularly well-positioned to capitalize on this regulatory change because they already had an existing fleet of drivers, allowing them to bypass the "chicken-or-the-egg" barrier that typically plagues new entrants in the Ride-Hailing Market—the challenge of attracting drivers without passengers and passengers without drivers.

81.    The Defendants' apps then became the cheaper and more convenient option in the Ride-Hailing Services Market. As reported by *Business Insider*, at the same time that Uber's price skyrocketed, as noted above, Curb had "seen average ride prices between January and June drop to $13.63 in 2021 from $16.46 in 2020 and $16.89 in 2019."[28] This allowed Curb to see a 300% increase in active users from mid-2021 to mid-2022 and to become a "multimillion-dollar app," according to Mark Hamstra in *CO— by the US Chamber of Commerce*,[29] "by bringing taxis into the Uber economy" and by "[d]ifferentiating from Uber and Lyft by paying drivers more and charging riders less."

82.    Uber here saw a dual opportunity: protecting its market position while making taxis directly available on its platform by conspiring with the Defendants. The Defendants, in turn, recognized the significant potential to expand their consumer base by joining the Uber platform.

83.    The Defendants were in fact expanding rapidly and gaining market share through independent innovation and growing local consumer loyalty. Rather than continue competing head-to-head with Uber and Lyft, they decided to 'merge' their services with Uber—not through a corporate acquisition but through collusion and technological integration—to monetize Uber's vast consumer base and platform reach.

---

[28] Allana Akhtar, *As Uber and Lyft Fares Surge, NYC Taxis Are Becoming Popular Again*, BUSINESS INSIDER (Aug. 27, 2021), https://www.businessinsider.com/e-hailing-taxis-curb-increasing-faster-than-uber-lyft-nyc-2021-8 (last visited Oct. 6, 2025).

[29] Mark Hamstra, *How Curb Became a Multimillion-Dollar App by Bringing Taxis Into the Uber Economy*, U.S. CHAMBER OF COMMERCE (June 8, 2022), https://www.uschamber.com/co/good-company/the-leap/how-curb-entered-ride-hailing-economy (last visited Oct. 6, 2025).

84.    By doing so, the Defendants traded their growing competitive momentum for access to Uber's scale and revenue streams. Uber, in turn, was able to further suppress competition that would otherwise have constrained prices and benefited consumers.

### ii.    The Defendants and Uber Entered into Agreements to Eliminate Competition in the Relevant Market

85.    Beginning in March 2022, Uber entered into a series of agreements with the Defendants to integrate their ride-hailing capabilities onto the Uber platform (the "Agreements"). These Agreements have given rise to a Ride-Hailing Cartel (the "Cartel"), with Uber and the Defendants fixing prices, charging riders higher amounts, and restraining competition.

86.    On March 23, 2022, Uber and Curb announced a partnership that would allow New York City taxis to be hailed through the Uber app. The next day, Uber announced a similar agreement with CMT, the parent company of ARRO. Curb's CEO Amos Tamam acknowledged the implications of this collaboration (and confirmed the relevant market), stating: "Teaming up with your biggest competitor is always a concern, but who's to say two competitors cannot yield a better result?"[30]

87.    On November 10, 2022, Uber and FlyWheel announced signing a similar partnership. FlyWheel President Hansu Kim framed the partnership as a technological and economic breakthrough, stating: "This partnership establishes a global network of professional drivers and fleets, and brings our cutting-edge e-hailing technology and established footprint together with Uber's leading demand for a seamless partnership."[31] Uber's Director of Business

---

[30] Courtney Sisk, *Uber, Chicago Taxis Expand Partnership That Allows Taxi Drivers to Pick Up Riders Requesting Through Uber*, NBC CHICAGO (Apr. 11, 2024), https://www.nbcchicago.com/news/local/uber-chicago-taxis-expand-partnership-that-allows-taxi-drivers-to-pick-up-riders-requesting-through-uber/3407969/ (last visited Oct. 6, 2025).

[31] Flywheel Technologies, Inc., *Flywheel to Partner with Uber in Large National Partnership*, PR NEWSWIRE (Apr. 7, 2022), https://www.prnewswire.com/news-releases/flywheel-to-partner-with-uber-in-large-national-partnership-301519635.html (last visited Oct. 6, 2025).

Development, Guy Peterson, echoed this messaging, stating the agreement would "give drivers increased flexibility and additional earnings opportunities as the pandemic recovery continues."[32]

88.     Uber formally acknowledged these partnerships in its Q1 2022 earnings release, describing them as part of its broader effort to "list all New York City and San Francisco taxis on the Uber app through partnerships with CMT, Curb, Yellow Cab SF, and Flywheel Technologies."[33] In its Q1 2023 earnings release, Uber confirmed that "100% of New York City taxi supply is now connected to Uber."[34]

89.     While these partnerships were marketed as pro-consumer and pro-driver, purporting to expand options and restore incomes in the wake of COVID-19, they had the opposite effect. Instead of increasing competition, the Agreements function to eliminate it. The partnerships transformed Uber's burgeoning rivals into co-conspirators and allowed Uber to control an even greater share of the Ride-Hailing Services Market and further establish its dominant position.

90.     According to the *Wall Street Journal*, Uber and the Defendants agreed to share revenue from each ride, although the specific terms were not disclosed—but Uber's average cut in these instances is estimated to be approximately 20% per ride.[35]

91.     Through these agreements, Uber and the Defendants fix prices, restrain trade, and further entrench Uber's dominant position in the Ride-Hailing Services Market, all while

---

[32] *Id.*

[33] Uber Technologies, Inc., *Uber Announces Results for First Quarter 2022*, BUSINESS WIRE (May 4, 2022), https://www.businesswire.com/news/home/20220504005405/en/Uber-Announces-Results-for-First-Quarter-2022 (last visited Oct. 6, 2025).

[34] Uber Technologies, Inc., *Uber Announces Results for First Quarter 2023*, INVESTOR RELATIONS (May 2, 2023), https://investor.uber.com/news-events/news/press-release-details/2023/Uber-Announces-Results-for-First-Quarter-2023/default.aspx (last visited Oct. 6, 2025).

[35] Preetika Rana, *Uber Reaches Deal to List All New York City Taxis on Its App*, THE WALL STREET JOURNAL (Mar. 24, 2022), https://www.wsj.com/business/hospitality/uber-reaches-deal-to-list-all-new-york-city-taxis-on-its-app-11648123201 (last visited Oct. 6, 2025).

presenting the partnership as a public benefit. Once a disruptive platform offering consumers accessible and affordable rides, Uber is instead set to become a vehicle to bolster and legitimize the Cartel's high fixed prices. The result is a Ride-Hailing Services Market yet again further concentrated in Uber's hands.

### iii.    The Defendants and Uber Participate in Horizontal Price-Fixing

92.    Under the Agreements, Uber and the Defendants started aligning prices between (i) UberX, (ii) taxis hailed through the Uber app—using the Defendants' technology, and (iii) taxis hailed directly on the Defendants' platforms. This practice effectively eliminates price competition among Uber and the Defendants.

93.    This price fixing is not implicit or inferred—it is openly published and confirmed by Uber itself. Uber's own website explains that Yellow Taxi riders in New York City "[e]njoy the same price as UberX while riding with a fully licensed taxi driver."[36] This public confirmation of price alignment removes any doubt as to the existence and scope of the pricing coordination among Uber and the Defendants. This is confirmed by in-app observation. In cities where Cartel members entered into the price-fixing agreements, prices are the same or similar across the three channels (Figure 4). In contrast, in cities where Cartel members operate without such agreements, prices vary between providers (Figure 5).

---

[36] Uber Technologies, Inc., *New York City Taxis Near Me – Request a Yellow Cab 24/7*, https://www.uber.com/us/en/r/cities/taxi/new-york-city-new-york-city-us/ (last visited Nov. 19, 2025).



















**Figure 4: In-app observations in cities where the Cartel fixes prices**
(Uber left; Curb right)





**Figure 5: In-app observations in cities where the Cartel does not fix prices**
(Uber left; Curb/Arro right)

94.     In the Local Markets, even where they are not identical, prices are fixed by the Cartel. As reported by *Axios*, for example, Uber applies a pricing strategy in Chicago where fares for taxis booked through the Uber app are "priced similarly to UberX."[37]

95.     In effect, the co-conspirators in the Cartel have agreed to fix prices at either uniform or similar rates regardless of whether a passenger is served by a taxi hailed using the Defendants' technology or an FHV hailed directly by Uber. This eliminates price variability between competitors, undermines consumer choice, and directly contradicts the core principles of competitive market dynamics.

96.     The express alignment of fares among Uber and the Defendants reflects classic horizontal price-fixing in violation of the antitrust laws. Rather than competing on price, Uber and the Defendants have agreed to set prices across providers, insulating themselves from market discipline and maximizing revenue at the expense of consumers.

### g.  The Expansion of the Cartel Through Further Technological Integration

97.     The integration of Uber and Curb is not limited to city-specific partnership agreements; it is now enforced and operationalized through a shared technological system: Curb Flow. Launched in December 2023, Curb Flow purports to be an open application programming interface ("API") that facilitates interoperability between taxi fleets and ride-hailing platforms. In reality, it functions as a technological hub for the Cartel, facilitating horizontal price alignment between Uber and Curb.

98.     Curb Flow operates on the driver side of Curb's two-sided ride-hailing platform. It integrates Uber, a "launch partner," into Curb's ride-hailing infrastructure. In cities where Curb

---

[37] Carrie Shepherd, *Uber Welcomes Taxi Drivers to Its Chicago App*, AXIOS (Apr. 12, 2024), https://www.axios.com/local/chicago/2024/04/12/uber-app-taxi-cabs-chicago (last visited Oct. 6, 2025).

Flow is active, when a rider requests an UberX through the Uber app, the API enables a taxi using Curb's app to fulfill that request.

99.     This means that when a user orders an UberX through the Uber app, a taxi dispatched through Curb's ride-hailing system might fulfill the request.[38] UberX now combines FHVs hailed directly by Uber and taxis hailed using Curb's technology—all at the same price. The two services have effectively merged while users can still elect to order a taxi through either the Uber app or the Curb app for the same price. On the driver's side, the requests appear in one integrated system.

100.    This mechanism provides the most efficient means for the Cartel to enforce a uniform fare structure across what would otherwise be horizontally competing service providers. As stated on the Uber website: "Whether you're matched with an UberX driver or a taxi driver in New York City, the price will be the same."[39] The same language appears on the Los Angeles, San Diego, San Francisco, and Washington, D.C. pages of the Uber website.

101.    Curb Flow is already fully operational in the local markets of Washington, D.C., Chicago, New York, and San Francisco. In these markets, there is no price differentiation, no consumer-facing choice, and no incentive for either party to offer a lower fare. While Curb Flow is marketed as an "open API," it functions here not as a competitively neutral tool. If open APIs can promote competition by increasing interoperability or lowering switching costs, Curb Flow is here used to further standardize pricing across competitors and eliminate intra-platform competition.

---

[38] Juliana Valencia & Sophia Barnes, *Next time you call an Uber in DC, a taxi could pop up. Here's why*, NBC WASHINGTON (Nov. 17, 2023), https://www.nbcwashington.com/news/local/uber-taxi-partnership-washington-dc-cab/3473563/ (last visited Oct. 21, 2025).

[39] Uber Technologies, Inc., *New York City Taxis Near Me – Request a Yellow Cab 24/7*, https://www.uber.com/us/en/r/cities/taxi/new-york-city-new-york-city-us/ (last visited Nov. 19, 2025).

102.    Beyond price-fixing, Curb Flow also allows the exchange of competitively sensitive data between Uber and Curb. Uber gains real-time access to supply-side data from Curb, including taxi availability, fleet utilization, and dispatch volumes, allowing it to monitor and anticipate pricing conditions in the taxi segment. In return, Curb receives demand-side data from Uber, including geographic ride density, user booking behavior, and UberX fulfillment trends. This reciprocal data exchange enables both parties to optimize and maintain price alignment across all cities where Curb Flow expands, *with or without* explicit contemporaneous agreements.

103.    The long-term trajectory of the arrangement is evident. Curb no longer competes for users on the passenger side of its two-sided platform; instead, it can rely on UberX orders fulfilled through Curb Flow on the driver side of its platform. This eliminates Curb's incentive to compete independently on price.

### h.  The Anticompetitive Purpose and Effects of the Ride-Hailing Cartel

#### i.    *The Agreements Preclude Uber from Competing on Price with Defendants in the Ride-Hailing Services Market*

104.    The challenged conduct at issue is the kind that the antitrust laws were enacted to prevent: the suppression of price competition through a horizontal agreement among competitors. The Agreements do not reflect mere parallel behavior; they are explicit, formalized contracts among competing entities in the Ride-Hailing Services Market, aiming at "raising, depressing, fixing, pegging, or stabilizing the price of a commodity." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940).

105.    Uber and the Defendants publicly announced and implemented their intent to eliminate price variability across providers. As confirmed by Uber's website and in-app pricing, taxi rides booked in the Geographic Markets through the Uber app now cost the same, or nearly

the same, as UberX rides. This coordination removes price as a dimension of competition and denies consumers the ability to choose among providers based on cost.

106.    The result is a violation of the Sherman Act: a "contract, combination, or conspiracy" among horizontal competitors to fix prices. 15 U.S.C. § 1. Under long established precedent, such price-fixing is unlawful *per se* and does not require further inquiry into market power or actual anticompetitive effects.

> ii.    *Supracompetitive Prices and Lower Driver Pay Confirm the Cartel's Anticompetitive Impact*

107.    The market consequences of the Agreements confirm their anticompetitive nature. Following implementation, average fares for the Cartel rose markedly, even as operational conditions stabilized post-pandemic. Prices rose to supracompetitive levels, producing higher revenue for the co-conspirators while leaving consumers with no meaningful alternative at a lower price point.

108.    The TLC provides details of all rides hailed in New York City, where the first agreements were signed. Plaintiff analyzed over 1.4 billion trips performed by the Ride-Hailing Apps from July 2018 (the earliest month available)[40] to September 2025 (the most recent month available). Trips were then separated from before the Agreements (565 million over 44 months) and after the Agreements (847 million over 43 months).

109.    <u>Supracompetitive Prices</u>. To isolate the competitive effects of the Agreements from broader market conditions, this analysis uses Lyft as a benchmark. Numerous factors affect all participants in the Ride-Hailing Services Market equally, including fluctuations in fuel costs, insurance rates, regulatory changes, labor market conditions, and shocks like the COVID-19

---

[40] Data availability begins in July 2018 for Curb (flex fare), February 2019 for Uber and Lyft, and March 2020 for Arro (flex fare).

pandemic's dramatic impact on demand and operations. Because Lyft—the only significant competitor not party to the Agreements—faced these same external pressures, comparing the Cartel members' pricing and service metrics to Lyft's allows to control for market-wide variables. Any divergence between Lyft's trajectory and that of the Cartel members beyond what these common factors would predict can be attributed to the anticompetitive conduct alleged herein. This ensures that the measured harm reflects the Agreements' impact rather than external market forces affecting the industry as a whole.

110.    Following the Agreements, consumers hailing rides from the Cartel were charged an additional $8.51 per trip on average, representing a 37% increase—far more than Lyft's 19% increase. This change was implemented through a clear reversal of competitive pricing: Pre-Agreements, the Cartel undercut Lyft by $1.69 per trip on average; post-Agreements, the Cartel charged $2.29 more per trip on average (Table 1).

111.    Yet the Cartel maintained similar market share, declining only from 74.1% to 73.4%, despite charging substantially more per trip than Lyft. This defies normal competitive dynamics, where lower prices typically gain market share.

112.    After the Agreements, Defendants Arro's and Curb's trip volumes per month surged by 735% and 408% respectively, despite moving in opposite pricing directions—Arro raising prices by 39%, while Curb reduced prices by 34%. Simultaneously, Uber and Lyft trip volumes grew by 26% and 32%, respectively, recovering to pre-pandemic levels, yet Uber raised prices by 39% compared to Lyft's 19% increase.

113.    These patterns are inconsistent with competitive market dynamics. In competitive markets, substantial price increases drive volume losses while price cuts capture market share. Instead, Cartel members achieved dramatic volume growth regardless of pricing strategy, and Uber

raised prices 39% versus Lyft's 19% without losing market share—behavior that suggests coordinated market segmentation rather than competition.

| | *Arro* | *Curb* | *Uber* | *Lyft* | *Uber v. Lyft* | *Cartel v. Lyft* |
|---|---|---|---|---|---|---|
| *Before Agreements (Jul 2018 – Feb 2022)* | | | | | | |
| *Trips (total)* | 332,626 | 2,449,800 | 416,425,996 | 146,607,774 | 74.0% | 74.1% |
| *Fare per trip* | $ 17.71 | $ 35.70 | $ 22.63 | $ 24.39 | -$1.76 | -$1.69 |
| *After the Agreements (Feb 2022 – Sept 2025)* | | | | | | |
| *Trips (total)* | 2,778,393 | 12,158,554 | 607,470,394 | 225,489,588 | 72.9% | 73.4% |
| *Fare per trip* | $ 24.62 | $ 23.71 | $ 31.39 | $ 28.92 | +$2.47 | +$2.29 |
| *Fare per trip change* | +39% | -34% | +39% | +19% | +$4.23 | +$3.98 |

**Table 1: Trips and fare per trip in New York City before and after the Agreements**
(excludes tips; includes fares, surcharges, taxes, tolls)

114.    Over 622 million Cartel trips were taken after the Agreements at inflated prices. Consumers have paid an estimated $5.3 billion more as a result. The Agreements also likely created an umbrella pricing effect: even non-conspirator Lyft raised prices by 19%, demonstrating how the Cartel's coordinated behavior degraded market-wide competition.

115.    Curb's average fare per trip is the only one to decrease (by 34%), which can be explained by the economic dynamics of cartel formation and market allocation. When a cartel forms, it takes time to establish coordination mechanisms. Once operational, profit extraction becomes systematic and substantial. Curb's willingness to reduce its per-trip fare must be understood in the context of what it gained: access to coordinated pricing with Uber's dominant network and a 408% increase in trip volume.

116.    Curb sacrificed short-term per-trip revenue to secure its position within the Cartel structure, knowing that coordinated pricing would enable gradual fare increases over time without

competitive pressure. Having established price discipline and market allocation among the conspirators, the Cartel could and did systematically raise prices in lockstep.

117.    <u>Similar Demand and Quality; Higher Real Prices and Lower Pay</u>. The volume fluctuations between the two periods were primally driven by the COVID-19 pandemic and subsequent recovery. Trip volumes plummeted during pandemic lockdowns and only gradually recovered, returning to pre-pandemic levels only in 2023 (Figure 6). Of those totals, Lyft maintained similar market shares (25.9% pre-Agreements to 26.6% post-Agreements), demonstrating that recovery to pre-pandemic volumes was achievable without cartel coordination.



**Figure 6: Average monthly trip volumes in New York City Ride-Hailing Market**
(Uber, Lyft, Curb, and Arro combined)

118.    At the same time, Uber achieved minimal improvement in wait times (the TLC does not provide wait time data for Curb and Arro). Average wait time per ride declined from 4 minutes and 47 seconds pre-Agreements to 4 minutes and 36 seconds post-Agreements—a reduction of only 11 seconds. Moreover, Uber had already restored wait times to pre-pandemic levels by late 2021 and early 2022, before the Agreements took effect. Non-conspirator Lyft demonstrated

greater progress than Uber after the Agreements, even matching Uber's wait times in recent months (Figure 7).



**Figure 7: Average wait times for Ride-Hailing Services in New York City**

119.    One way to isolate the anticompetitive effects of the Agreements from the extraordinary market disruptions caused by the COVID-19 pandemic is to compare 2019 data (representing normal pre-pandemic market conditions) with the 2023-2025 period (after the market had stabilized and trip volumes returned to pre-pandemic levels).

120.    After adjusting for inflation using the *Consumer Price Index* in New York City, [41] the real fare increases show that Uber and the Defendants are imposing substantial real-price hikes far beyond general economic conditions (Table 2).

| | *2019* | *2023-25* | *2023-25 Adjusted for inflation* | *Real fare increase* |
|---|---|---|---|---|
| *Lyft* | $ 22.97 | $ 29.35 | $ 24.57 | 7% |
| *Uber* | $ 20.54 | $ 31.72 | $ 26.56 | 29% |
| *Cartel* | $ 20.60 | $ 31.49 | $ 26.36 | 28% |

**Table 2: Price increases adjusted for inflation**

121.    Despite these dramatic price increases, service-quality improvements were minimal. Average wait times improved by only 8 seconds for Uber, while Lyft improved by 4 seconds.

122.    The increases also cannot be explained by higher driver pay. In 2019, Uber drivers would take home 93% of the base fare, while Lyft drivers would only receive 67%. Over the 2023-2025 period, Uber drivers received 77% and Lyft 79%.

123.    While Lyft grew monthly trips by about 10%, Uber and the Cartel saw minimal changes, with declines of 3% and 1%, respectively, which translated with a 2% market share loss for the Cartel.

124.    In sum—over similar market conditions and adjusting for inflation—Uber and the Defendants extracted 28% more from consumers for an average of only 8 seconds of saved time and cut driver compensation from 93% to 77%, all while maintaining flat volumes and losing virtually *no* market share (declining from 76% to 74%). In a competitive market, such extreme price increases would trigger substantial market share losses as consumers switch to lower-priced

---

[41] U.S. Bureau of Labor Statistics, *Northeast Information Office*, https://www.bls.gov/regions/northeast/data/xg-tables/ro2xgcpiny1967.htm (last visited Oct. 29, 2025).

alternatives. The absence of this competitive penalty demonstrates market power derived from anticompetitive coordination rather than legitimate competition.

125.    <u>Price-Fixing Among Cartel Members</u>. To analyze price-fixing among Uber and the Defendants, Plaintiff estimates that the average fare per trip for UberX is approximately 75% to 80% of Uber's overall average fare. This estimate reflects the service and pricing mix across Uber's platform. UberX represents approximately 80% to 85% of ride trips, with premium services like UberXL, Comfort, and Black accounting for the rest.[42] While premium services command significantly higher prices, with Uber Black typically costing three times more than UberX for example,[43] their availability and use cases limit their revenue share. Given the high volume of standard-priced UberX trips and the smaller portion of premium-priced rides, UberX average fares are estimated to be 75% to 80% of the overall Uber fare per trip.

|  | *Arro* | *Curb* | *UberX* |
|---|---|---|---|
| *Before Agreements (Jul 2018 – Feb 2022)* | | | |
| *Fare per trip* | $ 16.77 | $ 35.70 | $16.97 - $18.11 |
| *After the Agreements (Feb 2022 – Sept 2025)* | | | |
| *Fare per trip* | $ 24.46 | $ 23.71 | $23.54 - $25.11 |

**Table 3: Price-fixing in New York City**

126.    The result is price convergence: Pre-Agreements prices varied widely, but post-Agreements prices among the Conspiracy all converged to the $23-25 range, eliminating price competition for 621 million trips and 73.4% of the market (Table 3).

---

[42] Cohen *et al.*, *Using Big Data to Estimate Consumer Surplus: The Case of Uber*, NBER WORKING PAPER NO. 22627 (Sept. 2016), https://www.nber.org/system/files/working_papers/w22627/w22627.pdf (finding UberX represented 80 percent of all Uber rides); Uber Technologies Inc., *Investor Day Presentation*, https://s23.q4cdn.com/407969754/files/doc_financials/2024/sr/uber-investor-update.pdf (last visited Nov. 19, 2025) (finding UberX represented 70 to 85% of all Uber Mobility, inclusive of bikes, scooters, rentals, and motos).

[43] Get Transportation, *What Is the Difference Between an Uber Taxi and Uber Black?*, https://www.get-transportation.com/what-is-the-difference-between-an-uber-taxi-and-uber-black/ (last visited Nov. 19, 2025).

127.    <u>Harm to Drivers</u>. On the other side of the market, Uber slashed driver compensation from 87% to 78% of base fare (the TLC does not provide pay data for Defendants Curb and Arro). The ability to simultaneously raise consumer prices by 29% while cutting driver pay by 9 percentage points—without losing market share—constitutes direct evidence of market power derived from anticompetitive coordination.

128.    By contrast, non-conspirator Lyft increased driver compensation by 7 percentage points (from 72% to 79%). Uber thus eliminated its competitive advantage in driver pay, declining from a 15-point premium over Lyft (87% versus 72%) to below parity (78% versus 79%). In a competitive market, Uber's dramatic reduction in driver compensation relative to Lyft should have triggered driver attrition and market share losses. Instead, Uber maintained its dominant position, further evidencing that the Agreements suppressed normal competitive dynamics (Table 4).

| | *Uber* | *Lyft* | *Uber v. Lyft* |
|---|---|---|---|
| *Before Agreements (Jul 2018 – Feb 2022)* | | | |
| *Driver pay % of base fare* | 87% | 72% | +15pp |
| *After the Agreements (Feb 2022 – Sept 2025)* | | | |
| *Driver pay % of base fare* | 78% | 79% | -1pp |
| *Change* | *-9pp* | *+7pp* | *-16pp* |

**Table 4: Estimated price-fixing in New York City among conspirators**

129.    After the Agreements, not only did Uber, Curb, and Arro raise the price of getting a ride in New York City, Uber simultaneously slashed driver compensation by nine percentage points—allowing it to capture profits from both sides of the market. Across Uber's 607 million post-Agreement trips, this pay cut diverted approximately $1.5 billion in driver wages to the Cartel.

130.    This is not happening only in New York. According to Uber's own reporting, driver pay across the United States has significantly declined following the Agreements. Figure 8 below shows the median Uber driver earnings per utilized hour before and after the Agreements.



**Figure 8: U.S. Median Driver Earnings Per Utilize Hour Fell After the Agreements**[44]

131.    In short, through the Agreements, Uber became a "A Cash-Generating Machine"[45] that charges higher prices and delivers lower pay, all at the expense of competition. Seeking their share of these supracompetitive profits, the Defendants abandoned competition in favor of Cartel coordination. The result was a systematic extraction of wealth on both sides of the Ride-Hailing Services Market.

### *iii.*    *The Cartel Substantially Affects Interstate Commerce*

132.    The Cartel's pricing scheme substantially affects interstate commerce. Uber and the Defendants operate across multiple states, and millions of rides facilitated through the Uber app cross state lines, such as between New York and New Jersey or Washington, D.C. and Virginia.

---

[44]    Uber Under the Hood, *Understanding Uber's Share of Driver Earnings*, https://uberpubpolicy.medium.com/understanding-ubers-share-of-driver-earnings-d75c4d5f6e23 (last visited Oct. 7, 2025) (emphasis added in orange).

[45]    Len Sherman, *How Uber Became a Cash-Generating Machine*, Medium (June 27, 2025), https://len-sherman.medium.com/how-uber-became-a-cash-generating-machine-ef78e7a97230 (last visited Nov. 19, 2025).

133.    The Agreements also implicate interstate infrastructure, including electronic payment systems, cloud computing services, and national banking networks.

## V.    <u>CLASS INJURY AND STANDING</u>

134.    Plaintiff and each class have suffered injury of the type the antitrust laws were intended to prevent and flows from that which makes Defendants' act unlawful—namely, they have paid supracompetitive prices for rides in the Ride-Hailing Services Market.

135.    Defendants' misconduct has directly caused this injury to Plaintiff and each class. Plaintiff and each class are naturally motivated to enforce the antitrust laws because they had and have the natural economic self-interest in paying reasonable rather than supracompetitive prices.

## VI.    <u>CLASS ALLEGATIONS</u>

136.    Plaintiff bring this action on behalf of himself and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of six classes, which may comprise subclasses, to be defined based on discovery.

137.    The first class comprises all persons and entities who, during the Class Period, paid for rides hailed through the Uber app in Boston, Massachusetts.

138.    The second class comprises all persons and entities who, during the Class Period, paid for rides hailed through the Uber app in Chicago, Illinois.

139.    The third class comprises all persons and entities who, during the Class Period, paid for rides hailed through the Uber app in New York City, New York.

140.    The fourth class comprises all persons and entities who, during the Class Period, paid for rides hailed through the Uber app in Seattle, Washington.

141.    The fifth class comprises all persons and entities who, during the Class Period, paid for rides hailed through the Uber app in San Francisco, California.

142.    The sixth class comprises all persons and entities who, during the Class Period, paid for rides hailed through the Uber app in Washington, D.C.

143.    These classes exclude (i) the Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; and (ii) the Judge, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.

144.    Plaintiff reserves the right to amend any of these class definitions if further investigation, discovery, or both indicate that such definitions should be narrowed, expanded, or otherwise modified.

145.    The members of each class are so numerous that joinder of all members is impracticable. The precise number of members of each class is unknown to Plaintiff at this time, but based on the volume of rides documented in publicly available data, it is believed to be in the millions.

146.    The geographic dispersion of class members across multiple major metropolitan areas further renders joinder impracticable. Class members' claims are small relative to the cost of litigation, making individual litigation economically infeasible and class adjudication superior for judicial economy.

147.    The Defendants have acted on grounds that apply generally to the members of each class, so that final injunctive relief is appropriate respecting each class as a whole.

148.    Common questions of law and fact exist as to all members of each class and predominate over any questions solely affecting individual members of each class. Such common issues include:

    (a) Whether the Defendants and Uber entered into agreements to horizontally fix prices for the ride-hailing services market;

(b) Whether the Defendants' conduct constitutes a *per se* violation of federal antitrust laws;

(c) Whether the Defendants and Uber agreed to fix, raise, maintain, or stabilize prices for ride-hailing services;

(d) Whether the Defendants and Uber agreed to allocate markets or customers;

(e) Whether the Defendants' conduct caused supracompetitive prices to be charged to Plaintiff and class members;

(f) Whether, and to what extent, the Defendants' conduct caused Plaintiff and class members to suffer antitrust injury; and

(g) Whether Plaintiff and class members are entitled to damages.

149.    Plaintiff's claims are typical of the claims of the other members of each class he seeks to represent. The Agreements were implemented in a uniform manner across all relevant local markets, imposed substantively identical price-fixing restraints, and produced the same type of anticompetitive effects. Because Plaintiff purchased in a market subject to the same Agreements and resulting overcharges as all other class members, his injury arises from the same course of conduct and legal theory as theirs. The Defendants' practices have targeted and affected all members of each class in a similar manner, *i.e.*, they have all sustained damages arising out of the Defendants' practices.

150.    Plaintiff will continue to fully and adequately protect the interests of the members of each class. Plaintiff has retained counsel competent and experienced in antitrust class actions. Plaintiff has no interests in conflict with those of any class.

151.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

152.    The prosecution of separate actions by individual members of each class would impose heavy burdens upon the courts and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the classes.

153.    A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

154.    The interests of the members of each class in individually controlling the prosecution of separate actions are theoretical rather than practical. The classes each have a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. As the damages suffered by some of the individual class members may be relatively small, the expense and burden of individual litigation make it impossible for members of each class to individually redress the wrongs done to them. Plaintiff anticipates no difficulty in the management of this action as a class action.

155.    WHEREFORE, Plaintiff requests that the Court order that this action may be maintained as a class action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, that he be named Class Representatives, that Freedman Normand Friedland LLP be named Lead Class Counsel, and that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to each class.

## CLAIM FOR RELIEF

### COUNT I
### *Per Se* Violations of Section 1 of the Sherman Act
### (in the Alternative, Violations of the Rule of Reason)

156.    Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

157.    The Defendants and Uber are separate and distinct economic entities capable of conspiring under Section 1 of the Sherman Act.

158.    Beginning in March 2022 and continuing through the present, the Defendants and Uber entered into agreements, contracts, combinations, and conspiracies (the "Agreements") in unreasonable restraint of trade and commerce in the Ride-Hailing Services Market.

159.    The Defendants and Uber, through the Agreements, engaged in a horizontal scheme that suppressed competition among themselves and, without limitation, agreed to: (i) fix, raise, maintain, and stabilize prices for ride-hailing services; (ii) eliminate price competition among themselves; (iii) charge uniform or substantially similar prices for comparable ride-hailing services; (iv) coordinate pricing through technology integration systems; (v) share competitively sensitive pricing and market information; (vi) coordinate the allocation and fulfillment of ride requests through technological integration systems; and (v) agree to suppress independent competition on both side of the Ride-Hailing Services Market.

160.    The purpose and effect of the Agreements was and is to fix, raise, maintain, and stabilize prices among horizontal competitors, for ride-hailing services, to suppress competition for riders and drivers, and to entrench Uber's dominance and Defendants' coordinated position in the Ride-Hailing Services Market.

161.    The Agreements constitute *per se* violations of Section 1 of the Sherman Act. Horizontal price-fixing agreements among competitors are *per se* illegal and conclusively presumed unreasonable. No inquiry into the actual competitive effects of such agreements or any claimed procompetitive justifications is necessary or permitted.

162.    In the alternative, if the conduct does not fall within a recognized *per se* category, the Agreements unreasonably restrain trade under the Rule of Reason because they suppress

competition, raise fares paid by consumers, reduce driver compensation, degrade service quality, and produce no cognizable procompetitive benefits.

163.    The Agreements substantially affect interstate commerce. The ride-hailing services at issue are provided through national platforms, involve electronic payment systems that operate across state lines, utilize cloud computing infrastructure distributed across multiple states, and facilitate trips that cross state boundaries.

164.    As a direct and proximate result of the Defendants' violations of Section 1 of the Sherman Act, Plaintiff and each class have been injured in their business and property in that they paid supracompetitive prices for ride-hailing services.

165.    Plaintiff and each class have suffered and continue to suffer antitrust injury of the type the antitrust laws were designed to prevent and that flows from that which makes the Defendants' conduct unlawful.

166.    The injury to Plaintiff and each class was directly caused by the Defendants' anticompetitive conduct and is the natural and probable consequence of that conduct.

167.    Under Section 4 of the Clayton Act, Plaintiff and each class are entitled to treble damages and reasonable attorneys' fees for these injuries.

168.    The Defendants' violations of Section 1 of the Sherman Act are ongoing and continuing. Unless enjoined, the Defendants will continue to violate Section 1, and Plaintiff and each class will suffer irreparable harm for which there is no adequate remedy at law.

169.    Under Section 16 of the Clayton Act, Plaintiff and each class are also entitled to injunctive relief.

## DEMAND FOR JURY TRIAL

170.    Plaintiff respectfully demands a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the classes, respectfully request the

following relief:

(a) Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2) be given to the classes;

(b) Require the Defendants to pay for sending notice to the certified classes;

(c) Appoint Plaintiff as Class Representatives and Plaintiff's counsel as Class Counsel;

(d) Issue an injunction to enjoin the Defendants from continuing to engage in the anticompetitive conduct alleged herein;

(e) Award compensatory damages to Plaintiff and the proposed classes in an amount to be established at trial;

(f) Award treble damages as permitted by law;

(g) Award pre- and post-judgment interest;

(h) Award reasonable attorneys' fees and costs; and

(i) Award any other and further relief as may be just and proper.

Dated: November 24, 2025

/s/ *Kyle Roche*
Kyle Roche
Edward Normand
Stephen Lagos
**Freedman Normand Friedland LLP**
155 E. 44th Street, Suite 915
New York, New York 10017
(646) 494-2900
kroche@fnf.law
tnormand@fnf.law
slagos@fnf.law

Don Bivens (*pro hac vice*)
**Don Bivens PLLC**
15169 N. Scottsdale Road, Suite 205
Scottsdale 85254
(602) 762 2661
don@donbivens.com

*Attorneys for Plaintiff*